SIERRA CLUB et al., Plaintiffs,

v.

ATLANTA REGIONAL COMMISSION et al., Defendants.

No. CIV.A.1:01–CV0428BBM.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 15, 2001.

1350

Stephen Wesley Woolf, Southern Environmental Law Center, Atlanta, GA, Robert E. Yuhnke, phv, Boulder, CO, J. David Farren, phv, Southern Environmental Law Center, Chapel Hill, NC, for plaintiffs.

William R. Bassett, Harvey M. Koenig, Mikel Lemaul Purcell, Smith Bassett Purcell & Koenig, Diane L. DeShazo, State of Georgia Law Department, Daniel M. Formby, Rene Octavio Lerer, Cathy A. Cox-Brakefield, Thurbert E. Baker, Alan Gantzhorn, Office of State Attorney General, Patricia T. Barmeyer, King & Spalding, Atlanta, GA, Richard H. Deane, Jr., U.S. Attorney, Julia B. Anderson, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, John C. Cruden, Norman L. Rave, Jr., U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, James C, Thomason, III, Federal Highway Administration, Atlanta, GA, Robert Clinton Chambers, George Daryl Wenick, Smith Currie & Hancock, Atlanta, GA, David M. Friedland, Gus B. Bauman, David M. Williamson, Beveridge & Diamond, Washington, DC, for defendants.

## ORDER

MARTIN, District Judge.

This action seeking injunctive and declaratory relief for violations of, *inter alia,* the Clean Air Act, is currently before the court on the plaintiffs' motion for preliminary injunction [Doc. No. 15–1] and two oral motions to strike brought by each group of opposing parties.

*Factual and Procedural Background*

The plaintiffs, four public interest organizations [1] with members purportedly affected by the air quality in the Atlanta metropolitan area, filed this action on February 13, 2001 against federal, state and regional transportation agencies and officers [2] for declaratory and injunctive relief. The suit challenges the agencies' adoption, approval and funding of the 2025 Regional Transportation Plan ("2025 RTP"), the 2001–03 Transportation Improvement Plan ("2001–03 TIP"),[3] and the associated con-

---

1. The plaintiff organizations include: the Sierra Club, Southern Organizing Committee for Economic and Social Justice, Georgia Coalition for the People's Agenda, and Environmental Defense. The complaint alleges jurisdiction under 28 U.S.C. § 1361 and under 28 U.S.C. § 1331 through the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706.

2. The defendants include: Atlanta Regional Commission ("ARC"), Georgia Department of Transportation, Georgia State Transportation Board, United States Department of Transportation ("USDOT"), Federal Highway Administration, Federal Transit Administration

and the directors of these agencies. The Environmental Protection Agency ("EPA") is not a party to this suit.

3. The Federal–Aid Highway Act, 23 U.S.C. §§ 101–160, establishes comprehensive programs to provide federal funding and financial assistance to states for regional and local highway projects. The statute requires all urban areas with a population over 50,000 to have a continuous, cooperative, and comprehensive transportation planning processes to be carried out by a metropolitan planning organization ("MPO"). *See* 23 U.S.C. § 134. Each MPO must prepare a regional transportation plan ("RTP"), encompassing at least 20

formity determinations under section 176(c) of the Clean Air Act ("CAA") for Atlanta's ozone nonattainment area. The plaintiffs allege that the defendants are seeking to advance several significant regional highway projects in the Atlanta area, despite the region's existing ozone nonattainment.[4] The plaintiffs further allege that in recent years the defendants employed several tactics to adopt, fund and implement the 2025 RTP and 2001–03 TIP without following the proper procedures and guidelines.

The 1990 amendments to the CAA required that the Atlanta metropolitan area attain the NAAQS for ozone by November 1999 because Atlanta is classified as a "serious" ozone non-attainment area under 42 U.S.C. § 7511(a). To meet this deadline, the state of Georgia was required, pursuant to 42 U.S.C. § 7511a, to submit to EPA for approval a SIP that provided for attainment of the standard by the attainment date. In 1996, Georgia proposed to the EPA a "Reasonable Further Progress SIP" ("RFP SIP") that required a 9% reduction in NOx emissions by 1999.[5] On March 18, 1999, EPA approved the RFP SIP. To meet the 9% reduction, the RFP SIP estimated motor vehicle emissions for NOx and required that emissions reductions would not exceed 214.77 tons per day ("tpd"). Thus, the plaintiffs allege that the Atlanta area was required by the approved RFP SIP to meet the reduced emission of 214.77 tpd of NOx by November 1999. It is undisputed that Atlanta has not, as of this date, met the reduced emission rate for the attainment deadline of November 1999.

years, to identify regional transportation needs, develop an integrated transportation system, and assess the capital investments necessary to maintain or construct existing and future roadways or other transit facilities. *See id.* § 134(g). From the RTP, the MPO also must develop a more specific transportation improvement plan ("TIP") that identifies the projects to be carried out over the subsequent three-year period. The TIP must be updated at least every two years. *See id.* § 134(h). In this case, the MPO is co-defendant ARC and the RTP and TIP at issue are the 2025 RTP and the 2001–03 TIP. The cost of the 2001–03 TIP is approximately $1.9 billion.

**4.** The CAA, enacted in 1970 and extensively amended in 1977 and 1990, establishes a joint state and federal program to control the nation's air pollution. Section 109 of the Act, 42 U.S.C. § 7409, requires the EPA to establish national ambient air quality standards ("NAAQS") that are necessary to protect public health and welfare against certain pollutants, including ozone. For areas that are not in attainment for the ozone NAAQS, the CAA establishes dates, known as "attainment dates," by which the ozone NAAQS must be met. Ozone is formed when nitrogen oxides ("NOx") react with volatile organic compounds ("VOC") in the presence of sunlight.

Section 110 of the CAA, 42 U.S.C. § 7410, contemplates that the measures necessary to attain the NAAQS will be applied to individual sources through state implementation plans ("SIPs") prepared by each state, subject to EPA review and approval. A SIP must specify emissions limitations and other measures necessary to attain and maintain the NAAQS for each pollutant. Each control SIP must identify the total allowable emissions consistent with meeting the applicable control requirement, and it must allocate that total between motor vehicles and stationary sources. The allocation for vehicle emissions is called the motor vehicle emissions budget ("MVEB"). The MVEB is defined as "that portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan ... for a certain date for the purposes of meeting further progress milestones or demonstrating attainment or maintenance of the NAAQS." *See* 40 C.F.R. § 93.101.

**5.** Under both the 1977 and the 1990 amendments, reasonable further progress denotes the annual incremental reductions in emissions that are necessary to achieve the NAAQS by the statutory deadline. Every SIP must contain enforceable measures that provide for reasonable further progress. *See* 42 U.S.C. § 7511a(c)(2).

The plaintiffs allege that, despite the Atlanta area's failure to meet the 1999 ozone attainment deadline, the defendants have ignored the RFP SIP mandate and have attempted to propose and fund several new highway projects through illegal means. The plaintiffs assert that these new highway projects will increase automobile capacity and thereby contribute to more NOx emissions in violation of the RFP SIP. The plaintiffs allege the defendants first created a "grandfather" loophole for certain highway projects that had received previous approvals to approve funding of 61 capacity expansion highway projects. However, the plaintiffs state that the "grandfather" loophole was successfully challenged nationally, through a petition for review filed in the District of Columbia Circuit. The challenge resulted in a June 1999 settlement with the defendants, resulting in a deferral of 44 of these projects.

However, the plaintiffs assert that in early 2000 the defendants again sought to advance new capacity-increasing highway projects through the proposed 2025 RTP and 2001–03 TIP. On March 22, 2000, defendant ARC, as the MPO in this action, adopted the current plan, program, and conformity determination, which were submitted to the USDOT on April 4, 2000. The conformity analysis was based on a MVEB contained in a new attainment SIP submitted by the State of Georgia in October of 1999. Although EPA has not taken final action on that submission, EPA found the emissions budget "adequate" for conformity purposes on February 15, 2000. The proposed SIP provided a budget goal of 224 tpd of NOx to be attained by the year 2003.

The plaintiffs petitioned the Eleventh Circuit for a review of the EPA's decision (finding the new SIP adequate) as illegally extending until 2003 the mandatory 1999 RFP SIP deadline for Atlanta to meet the NAAQS. On July 18, 2000, the Eleventh Circuit issued a stay of the use of the revised MVEB for transportation planning purposes and enjoined federal approval of the 2025 RTP and 2001–03 TIP, which had already been approved by local and state agencies. In December 2000, the MVEB challenge was settled through an agreement between the plaintiffs, the EPA, and the State of Georgia. Pursuant to the settlement, the Eleventh Circuit remanded the EPA's decision, Georgia withdrew the MVEB, and the EPA withdrew its acceptance of the MVEB for 2003.

Because the Eleventh Circuit stayed the newly proposed SIP, it is the plaintiffs' position that the defendants were required to find conformity with the MVEB in the RFP SIP. Plaintiffs argue, however, that rather than conform to the RFP SIP, the defendants approved the 2025 RTP and 2001–03 TIP (on the theory that motor vehicle emissions need not comply with the MVEB in the RFP SIP until 2005) and that they did so without notice or opportunity for public comment. The plaintiffs state that the newly approved date of MVEB compliance would allow the advancement and completion of all new air quality-degrading highway project phases despite the alleged failure of the 2025 RTP to conform to the RFP SIP at any time until 2005, and the failure of the 2001–03 TIP to ever conform to the RFP SIP.

New federal funds for the highway projects in the 2001–03 TIP became available at the beginning of the fiscal year on October 1, 2000. Prior to that date, the plaintiffs state they notified the defendant agencies that they were preparing to challenge the approvals of the 2001–03 TIP, 2025 RTP and related conformity determinations. The plaintiffs allege that the defendants first sought to negotiate with the plaintiffs, but after three months broke off negotiations in January 2001 over issues of

enforceability. The plaintiffs subsequently filed the suit on February 13, 2001, which seeks a declaratory judgment to find that the defendants have violated numerous provisions of the CAA and the APA. In addition to declaratory relief, the plaintiffs also seek to vacate the defendants' actions to fund the 2001–03 TIP and to enjoin the advancement of the 2025 RTP and 2001–03 TIP until these plans are revised to fully conform with the RFP SIP attainment level.

On April 5, 2001, the plaintiffs moved for a preliminary injunction under Fed. R.Civ.P. 65(a) to enjoin the defendants from "engaging in, supporting in any way or providing financial assistance for, licensing or permitting, or approving any of these projects until further order of this Court and unless and until the violations of law set forth in the Complaint have ceased." The motion is based only on what the plaintiffs refer to as the "blatant statutory violations" alleged in Counts I, II, X and XI of the complaint.[6] After the motion was fully briefed, a hearing on the motion was held before the court on June 5 and 6, 2001. During the hearing, the plaintiffs and each group of defendants (ARC, state defendants and federal defendants) presented their arguments and the court heard testimony from Thomas L. Weyandt, Jr., Director of Comprehensive

---

6. Count I alleges that the defendants approved the 2025 RTP and 2001–03 TIP in violation of the CAA's conformity requirements. Count I states in part:

> The actions and decisions by defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP are not in accordance with law, in violation of CAA § 176(c)(1)(A), (c)(1)(B), (c)(2), and (c)(2)(A) and related regulations because the motor vehicles emissions analysis prepared by defendants fails to demonstrate that motor vehicle emissions of NOx will be reduced to 214 tpd as required by the MVEB in the applicable SIP during the first four years of the 2025 RTP and at any time during the period when the transportation projects are to be funded under the 2001–03 TIP.
>
> The actions and decisions by the defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP are not in accordance with law, in violation of CAA § 176(c)(1) and (2)(A), 42 U.S.C. § 7506(c)(1) and (2)(A), and related regulations because the motor vehicle emissions estimated for at least the first five years of the 2025 RTP and for the entire life of the 2001–03 TIP do not conform to the MVEB in the applicable implementation plan.

Complaint ¶¶ 100–01.

Count II alleges that the defendants wrongfully approved the 2025 RTP and 2001–03 TIP in violation of conformity deadlines. Count II states in part:

> The actions and decisions by defendants to adopt, submit, accept, approve, fund and assist the 2025 RTP and the 2001–03 TIP are not in accordance with law, in violation of CAA § 176(c)(1)(A) and (B), 42 U.S.C. § 7506(c)(1)(A) and (B), because defendants made no lawful finding or determination that the emissions of NOx from motor vehicles in the Atlanta nonattainment area in excess of the 214 tpd NOx MVEB in the "applicable implementation plan" will meet the statutory criteria for determining conformity as required by CAA § 176(c)(1)(A) and (B) including, but not limited to, a showing that such emissions "will not delay timely attainment of any standard or required interim emissions reductions or other milestones in any area."

Complaint ¶ 103.

Counts X and XI allege that the defendants disregarded several procedural and public participation requirements of the APA and numerous federal regulations. Specifically, Count X alleges that the defendants approved the projects without an opportunity for public comment in violation of the APA, 5 U.S.C. § 553. See Complaint ¶ 238. Count XI alleges that the USDOT "unlawfully made a conformity determination" because it did not provide, among other things, public notice, complete information, a report on the disposition of comments, and the opportunity for public review and comment as required by 40 C.F.R. § 93.105; and 23 C.F.R. § 450.316(b)(1). See Complaint ¶¶ 241–43.

Planning of ARC and the Honorable Roy E. Barnes, Governor of the State of Georgia. Both Mr. Weyandt and Governor Barnes testified on behalf of the defendants. At the conclusion of the hearing, the court orally ruled from the bench and denied the plaintiffs' motion. The court now issues this written order to detail its findings.

### Motion for Preliminary Injunction

■ A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir.2000) (en banc) (per curiam); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989). In the Eleventh Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion'" as to each of the

four prerequisites. *McDonald's,* 147 F.3d at 1306 (internal citation omitted); *see also Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975) (grant of preliminary injunction "is the exception rather than the rule," and plaintiff must clearly carry the burden of persuasion).

■ As an initial matter, the plaintiffs argue that the court should apply the same standards ˆof an "emergency petition" under Eleventh Circuit Rule 27–1(b)(1) in deciding to grant or deny the present motion.[7] The plaintiffs contend that the preliminary injunction prerequisites, which are identical to the factors noted in Rule 27–(b)(1), should also be analyzed and balanced in the same manner as the factors in Rule 27–1(b)(1). Under that analysis, a preliminary injunction should be granted even if the movants show "little, if any, immediate injury" as long as the movant "demonstrate[s] a very strong likelihood of success on the merits of his claim." *Freeman v. Cavazos,* 923 F.2d 1434, 1438 (11th Cir.1991) (discussing the balancing and application of Rule 27–1(b)(1) factors). This court rejects this novel theory, however, and will continue to subscribe to the long established rule that a movant for a preliminary injunction "must clearly establish[ ] the 'burden of persuasion' as to each of the four prerequisites." *Siegel,* 234 F.3d at 1176 (internal quotation marks omitted) (emphasis added).[8] This court

---

**7.** Eleventh Circuit Rule 27–1(b)(1) states in part:

(1) A party requesting emergency action shall label the motion as "Emergency Motion" and state the nature of the emergency and the date by which the action is necessary. The motion or accompanying memorandum shall state the reasons for granting the requested relief and must specifically discuss:

(i) the likelihood the moving party will prevail on the merits;

(ii) the prospect of irreparable injury to the moving party if relief is withheld;

(iii) the possibility of harm to other parties if relief is granted; and

(iv) the public interest.

*Id.* This rule was employed by the plaintiffs in petitioning for a stay for the proposed 1999 SIP. The Eleventh Circuit summarily granted the emergency motion and offered no other written analysis or opinion. The plaintiffs argue that this court should grant the current motion for preliminary injunction based in part on the Eleventh Circuit's disposition of the emergency motion for the stay.

**8.** As the Eleventh Circuit most recently reiterated in *Suntrust Bank v. Houghton Mifflin Co.,* 252 F.3d 1165, 2001 U.S.App. LEXIS 10802 (11th Cir. 2001) (per curiam):

While it falls within the district court's discretion to grant a preliminary injunction, *see Mitek Holdings, Inc. v. Arce Eng'g Co.,*

will apply the traditional standard requiring the establishment of all the prerequisites of a preliminary injunction. The court now addresses each of the prerequisites.

### I. *Irreparable Harm* [9]

██ The plaintiffs contend that the court should grant a preliminary injunction because irreparable harm will result if the 2025 RTP and the 2001–03 TIP are funded and construction begins before this case is decided on the merits. The plaintiffs present essentially five reasons why irreparable injury will result: (1) the projects contained in the 2025 RTP and 2001–03 TIP will exacerbate harmful ozone levels and delay conformity with the CAA thereby causing more health problems; (2) pursuing the projects in the 2025 RTP and the 2001–03 TIP will divert resources away from other projects which would be more beneficial to air quality; (3) contractual agreements for highway construction will be difficult or impossible to revoke when construction is underway; (4) failure to enjoin the 2001–03 TIP now will allow the defendants to prepare and complete the 2002–04 TIP and then argue that the 2001–03 TIP is moot; (5) failure to enjoin will preclude the court from providing guidance to agencies before the new 2002–04 TIP is prepared.

The defendants respond that the plaintiffs' allegations of irreparable injury fail because: (1) the plaintiffs point to no specific project that will be constructed in the time before this case could be decided on the merits that would increase ozone levels; (2) the plaintiffs have presented no evidence that any specific project in the 2025 RTP or 2001–03 TIP will lead to increased emissions even if completed before a disposition on the merits; (3) enjoining the 2025 RTP or 2001–03 TIP will not benefit the plaintiffs in that environmentally beneficial projects will also be stopped.

██ A showing of irreparable injury is " 'the sine qua non of injunctive relief.' " *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (hereinafter *City of Jacksonville* ) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury."); *Siegel*, 234 F.3d at 1179 ("[P]roof of irreparable injury is an indispensable prerequisite to a preliminary injunction...."); *McDonald's*, 147 F.3d at 1306 (plaintiff must show "irreparable injury will be suffered"); *Harris Corp. v. National Iranian Radio and Television*, 691

*Inc.*, 198 F.3d 840, 842 (11th Cir.1999), "[t]he district court does not exercise unbridled discretion." *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974); *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir.1992). Plainly, it must exercise that discretion in light of what we have termed the "four prerequisites for the extraordinary relief of preliminary injunction." *West Point–Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir.1982) (quoting *Canal Authority*, 489 F.2d at 572).... We add that a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the mov-

ant clearly carries its burden of persuasion on each of these prerequisites. *Canal Authority*, 489 F.2d at 573.

There is no question that the Eleventh Circuit requires the establishment of all four prerequisites and it would be an abuse of discretion if this court did not require the plaintiffs to show the existence of all the prerequisites.

**9.** Because the court first looked to whether the plaintiffs had made a showing of irreparable injury in making its decision not to issue a preliminary injunction, it will likewise lead with its analysis of that part of the test here.

F.2d 1344, 1356–57 (11th Cir.1982) (concluding that district court "did not abuse its discretion in finding a substantial likelihood of irreparable injury to [the plaintiff] absent an injunction"); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981) (to be granted a preliminary injunction plaintiffs must show "a substantial likelihood that they would suffer irreparable injury").

■■■■ "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel,* 234 F.3d at 1176; *Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir.1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of prevailing because plaintiff failed to meet burden of proving irreparable injury); *City of Jacksonville,* 896 F.2d at 1285 (reversing preliminary injunction based solely on plaintiff's failure to show irreparable injury); *Flowers Indus. v. FTC,* 849 F.2d 551, 552 (11th Cir.1988) (same); *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir.1983) (affirming denial of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm"). The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *City of Jacksonville,* 896 F.2d at 1285 (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 973 (2d Cir. 1989)); *accord Chacon v. Granata,* 515 F.2d 922, 925 (5th Cir.1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). "[P]reliminary injunctions have often been properly granted in environmental litigation.... In all such cases, however, preliminary injunctions have been issued not merely because some impact upon the en-

vironment has been alleged, but because the threatened harm has been properly shown to be irreparable, in accordance with the usual test for a preliminary injunction." *Canal Authority,* 489 F.2d at 574 (citations omitted). "Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate." *Id.* "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Id.* at 576.

For example, in *Sierra Club v. Martin,* 71 F.Supp.2d 1268 (N.D.Ga.1996) (hereinafter *Martin* ), the court found the plaintiffs had made a sufficient showing of irreparable harm and granted a motion for preliminary injunction to stop the defendants from logging in national forests. The plaintiffs alleged that the logging was in violation of the Clean Water Act, the National Forest Management Act, and the National Environmental Policy Act ("NEPA"). The court found that the harm alleged, such as the irreversible destruction of habitat and several protected species, constituted irreparable harm. The court found:

> In the instant case, the logging will destroy certain sensitive plants and animals located in the timber project areas, as well as suitable habitats for these and other similar sensitive and endangered species in the two Forests. No monetary award can recompense this injury; thus, there is no adequate remedy at law for these injuries.

*Id.* at 1327.

In contrast to *Martin,* in *Florida Wildlife Federation v. Goldschmidt,* 506 F.Supp. 350 (S.D.Fla.1981), the district court denied a motion to enjoin construction of a segment of Interstate 75 for allegedly violating NEPA. The district court denied the motion in part because it found the plaintiffs had failed to show that

irreparable harm, which the plaintiffs premised on over-development of the land, would occur. Specifically, the court found that the construction of the highway did not constitute irreparable harm because "there is no demonstrated proximate cause between the activities attacked and the harm feared." The court also found that even if the plaintiffs had shown that harm would directly result from the highway's construction, the alleged harm was not immediate enough for the court to issue an injunction before a disposition on the merits. The court stated:

[E]ven if plaintiffs had proven to a certainty that I–75 would induce massive secondary growth in the study area, and that such growth would inexorably result in environmental disaster, the process of building a highway and of developing the area cannot be accomplished overnight. Two of the sections of the interstate upon which construction has already begun will not be completed until 1982 at the earliest. Since other sections will not even be ready for bidding until 1981, it is safe to assume that the highway could not conceivably be finished until at least 1983. Upon completion of the highway, it would require several months, if not years, for the surrounding area to become completely developed. Surely, by that time, even with the congested dockets of this District, a trial on the merits would be concluded. Since only those injuries which cannot be redressed by the application of a judicial remedy after a hearing on the merits warrant the drastic and extraordinary remedy of a preliminary injunction, Plaintiffs would not be entitled to an injunction now against events which will occur, if at all, so far distant into the future that a full trial could be conducted before they came to pass.

*Id.* at 370 (citation omitted).

Finally, in *City of South Pasadena v. Slater,* 56 F.Supp.2d 1106 (C.D.Cal.1999), a case heavily relied upon by the plaintiffs, the court granted a motion to preliminarily enjoin construction of 4.5 miles of a highway extension to connect two other highways. The plaintiffs in that case alleged that the proposed highway extension violated, among other things, NEPA and the CAA. The plaintiffs also asserted that the highway's construction would destroy certain historic neighborhoods and contribute to new air pollution. The court found that the plaintiffs had shown a probability of success on the merits of their CAA claims because the proposed project did not come from a conforming TIP. The court also found that the construction of the highway extension would cause irreparable harm.[10] The court stated:

---

10. The Ninth Circuit employs a different standard for preliminary injunction than the Eleventh Circuit, as the court in *South Pasadena* described:

Within the Ninth Circuit a court may issue a preliminary injunction if the moving party meets one of two alternative tests. *See International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993). In the first test the moving party must demonstrate: "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief." *Id.* Alternatively, the moving party may demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Id.* These standards "are not separate tests, but the outer reaches of a single continuum." *Id. South Pasadena,* 56 F.Supp.2d at 1112. Regarding irreparable harm in the Ninth Circuit: "If the plaintiffs have demonstrated that there is a *possibility* of irreparable injury then a preliminary injunction is appropriate." *Id.*

The defendants concede that the [highway extension] will have significant impacts on historic resources. There is the possibility that it will also have significant impacts on the environment in the west San Gabriel Valley and significant air quality impacts which have yet to be appropriately considered.

The Court finds that there is the possibility of irreparable injury in this case arising from what appears to be violations of NEPA, Section 4(f) and the CAA. Additionally, the Court finds that this case does not present the sort of unusual circumstances that counsel against the issuance of an injunction. Therefore, the Court finds that a preliminary injunction is appropriate.

*Id.* at 1143.

In the present case, as noted above, the plaintiffs have produced several theories of irreparable harm. In support of their contention that the 2025 RTP and 2001–03 TIP will cause public health problems, the plaintiffs have submitted affidavits of Atlanta residents afflicted with asthma who aver that their condition is exacerbated by Atlanta's high ozone levels. The plaintiffs have also submitted the affidavit of LeRoy M. Graham, M.D., who is a specialist in pediatric pulmonary diseases. In his affidavit and attached documents, Dr. Graham recounts a study conducted by himself and other physicians which compared ozone levels during the Olympic Games in 1996 to before and after the games. Dr.

Graham concluded that ozone was substantially reduced during the Olympic Games and that this significantly reduced (by 41.6%) hospital admissions for people suffering from asthma. The plaintiffs contend that the reduction in ozone and hospital admissions was attributable to the alternative traffic planning and work schedules implemented during the Olympics. The defendants offered rebuttal of Dr. Graham's testimony through the testimony of Mr. Weyandt, who stated the reduction in hospital visits could have decreased for other reasons. Moreover, Mr. Weyandt noted that traffic congestion decreased in certain areas but increased in others,[11] thus disputing that overall traffic congestion during the games was actually reduced through the measures the plaintiffs emphasize.

In support of their argument that ozone levels will not increase before this case is decided on the merits, the state defendants have submitted the affidavit of Frank L. Danchetz, the Chief Engineer for the Georgia Department of Transportation. Mr. Danchetz notes projects in the 2001–03 TIP which are currently under construction and those planned for construction within the next twelve months. Mr. Danchetz states that out of thirteen projects currently under construction, only five of these projects are not classified as "exempt" projects and none of the five projects increase capacity through additional traffic lanes.[12] Similarly, Mr. Dan-

---

at 1142 (emphasis added) (citing *International Jensen*, 4 F.3d at 822). This standard for irreparable harm is inapposite to the Eleventh Circuit's requirement of "actual and imminent" injury. *See, e.g., City of Jacksonville*, 896 F.2d at 1285.

11. Specifically, Mr. Weyandt testified that traffic decreased in downtown Atlanta during the Olympics because much of the city was completely cordoned off to traffic and some 2,500 buses were relocated to Atlanta for Olympic spectators. Mr. Weyandt states that

these measures are unrealistic for the day-to-day activities of most cities. Mr. Weyandt also noted that traffic increased outside downtown Atlanta, especially around the perimeter highway.

12. A project is deemed "exempt" if it meets the criteria set forth in 40 C.F.R. § 93.126, such as projects for road safety or maintenance. An exempt project is eligible for authorization and funding even during a conformity lapse.

chetz also avers that out of thirteen projects scheduled to begin construction by June of 2002, only five of these projects are not classified as "exempt" projects. Thus, the defendants contend that of all the construction that could possibly take place within the time that this case could be decided on the merits, no projects would most likely be completed, and those projects under construction or scheduled for construction would contribute little if any to existing ozone levels even if the projects were in fact completed.

The defendants also emphasize the budget within the 2001–03 TIP to show that very little of the budget is allocated to capacity increasing highway projects. The defendants state that 40% of funds in the 2001–03 TIP are allocated for transit projects. Another 6% is allocated for sidewalks, bicycle paths and other bike and pedestrian transportation projects; 2% of the funds are allocated for HOV lanes; 4% is allocated for Transportation Demand Management [13] and air quality improvements. A significant portion of the 2001–03 TIP is allocated for safety and maintenance projects (13%), and 22% is allocated for improvements for intersections, interchanges and bridges. The defendants note that only 10% of the entire 2001–03 TIP is allocated for projects denominated as single occupancy vehicle road projects. Thus, the defendants argue that the 2001–03 TIP in its entirety would not significantly contribute to harm through increased ozone levels and certainly would not contribute to any "irreparable" harm.

The court finds that the plaintiffs have failed to establish the irreparable harm prerequisite for injunctive relief. Even assuming that everything in the affidavit of Dr. Graham is true, the plaintiffs have not proffered any evidence or proof of any immediate threat of a worsening of air quality in Atlanta. Although the plaintiffs have presented affidavits of those afflicted with ozone-induced asthma attacks, these affidavits do not show that the current 2025 RTP and 2001–03 TIP would exacerbate conditions which already exist. The Graham study concerning decreased asthma cases during the Olympic Games is also inconclusive as it too does not show how the 2025 RTP and 2001–03 TIP would create more ozone related respiratory problems. Moreover, the study relies on transportation measures reserved for extraordinary and unusual events such as the 1996 Olympics. Neither is this court persuaded that the highway projects which are the subject of this proceeding will be completed or even begin construction before this case is decided on the merits.

■ The plaintiffs' arguments surrounding diversion of funding, future mootness of the 2001–03 TIP, court guidance of future planning, and difficulty in stopping later executed construction contracts also fail as speculative or for lack of sufficient proof. These arguments, while no doubt earnest on the part of the plain-

---

13. Transportation Demand Management involves state implemented programs designed to create incentives and deterrents for commuters not to drive to work in single occupancy vehicles. Such programs include raising taxes on gasoline, subsidizing transit passes for commuters, increasing parking costs and other comparable measures. The plaintiffs contend that such measures were given an insufficient portion of the 2001–03 TIP budget even though the programs could reduce motor vehicle emissions immediately to reach the 214.77 tpd of NOx attainment level. In demonstrating the effectiveness of Transportation Demand Management, the plaintiffs have submitted the affidavits of Robert Johnston, a professor at the University of California—Davis and Michael A. Replogle, a Transportation Director at Environmental Defense. The defendants have moved to strike these affidavits as untimely.

tiffs, are conjecture at best. In the court's view, the possibility of the defendants making a mootness argument with regard to the 2001–03 TIP some time in the future cannot be the basis for a finding of the immediate threat of harm. Furthermore, with regard to the thirteen projects currently under construction and the thirteen more scheduled to begin in the next twelve months, plaintiffs have made no specific showing of the immediate harm associated with those projects. Finally, if the future transportation planning for this area requires or legally mandates the "court's guidance," that guidance can be provided without the granting of an injunction. In this court's view, none of these reasons constitute "irreparable harm."

Plaintiffs' diversion of funds argument also fails. The plaintiffs have not presented any evidence which demonstrates that funds flowing to the planned projects during the pendency of this action constitute irreparable harm. Although the funds may be currently spent on projects that the plaintiffs do not prefer, the plaintiffs' arguments in this regard seem to the court to be more a lament on how things could and should be better, rather than a demonstration of how irreparable harm will result. Moreover, the funds which the plaintiffs contend will be "gone" after the funds are spent on projects which they do not support is minimal when taking into account that only a maximum of ten nonexempt projects will be funded during the next twelve months.

In summary, this court finds that the facts before it fall more closely within the facts of *Florida Wildlife Federation* and is distinguishable from *Martin* and *South Pasadena.* The latter two cases clearly had an "actual and imminent" injury which the plaintiffs in this case have not shown. The highway construction in *South Pasadena* was also enjoined pursuant to the more liberal standard of preliminary in-

junction in the Ninth Circuit, making *South Pasadena,* in the view of this court, readily distinguishable from the case at bar.

In conclusion, the court finds that the plaintiffs have failed to establish the mandatory prerequisite of irreparable harm. The court now turns to the remaining prerequisites.

## II. *Substantial Likelihood of Success on the Merits*

The plaintiffs contend that they are likely to prevail with their demand that the adoption and approval of the 2025 RTP and 2001–03 TIP be vacated because: (1) ARC itself demonstrated that motor vehicle emissions in the 2025 RTP and 2001–03 TIP will exceed the MVEB in the RFP SIP until the year 2005; (2) the 2025 RTP and 2001–03 TIP will exacerbate and delay timely attainment of the RFP SIP deadline which was supposed to occur in 1999; and (3) regional, state and federal agencies failed to satisfy the notice and comment requirements of the federal conformity rules, the Georgia Conformity SIP and the APA. The court will address grounds one and two together and then consider the third ground separately.

### A. *Failure to Show Conformity with the 214.77 tpd MVEB in the RFP SIP and Failure to Meet the 1999 Attainment Deadline*

#### 1. *Statutory Background*

The purpose of the CAA is "to protect and enhance the Nation's air quality, to initiate and accelerate a national program of research and development designed to control air pollution, to provide technical and financial assistance to the States in the execution of pollution control programs, and to encourage the development of regional pollution control programs." *Conservation Law Found. v. Busey,* 79 F.3d 1250, 1256 (1st Cir.1996) (citing 42 U.S.C.

§ 7401(b)). Pursuant to the Act, the EPA established the NAAQS reflecting the maximum concentration levels of particular pollutants (criteria pollutants) allowable to protect public health. *See* 42 U.S.C. § 7409. Among them were NAAQS for ozone. *See* 40 C.F.R. § 50.9. Responsibility for achieving and maintaining the NAAQS falls on the states, which are required to submit SIPs specifying the manner in which they will achieve and maintain the NAAQS for the various criteria pollutants. *See* 42 U.S.C. § 7407. The EPA and the states have designated different regions according to the level of criteria pollutants in each area. *See* 42 U.S.C. § 7407(d)(1)(A). A region which has not attained the NAAQS for a certain criteria pollutant is designated a "nonattainment" area; a region about which there are insufficient data to determine compliance with the NAAQS is designated "unclassified" and deemed in compliance with the NAAQS. *See id.*

In 1977, Congress amended the CAA to ensure that transportation planning at the local level conforms to pollution controls contained in approved SIPs. To accomplish this, the 1977 amendments prohibit federal agencies from assisting, approving, or supporting "any [transportation] activity which does not conform to [an applicable SIP]." Pub.L. No. 95–95, tit. I, sec. 129(b), § 176(c), 91 Stat. 745, 750 (1977). However, because Congress "offered little guidance" on the 1977 conformity requirement, Congress amended the Act again in 1990 to expand the content and scope of this requirement.[14] *See* Pub.L. No. 101–549, tit. I, sec. 101(f), 110(4), § 176(c), 104 Stat. 2409, 2470 (1990) (codified at 42 U.S.C. § 7506(c)). The 1990 amendments also required states to revise their SIPs in a manner that would result in attainment of both the ultimate deadline and interim milestones established by the 1990 amendments. *See* 42 U.S.C. § 7511a(c)(2). For serious nonattainment areas for ozone, the statutory deadline for attaining the NAAQS was November 15, 1999. 42 U.S.C. § 7511(a)(1). The focus of this case, the 1990 amendments to transportation plan conformity determinations, make two changes. First, they establish general criteria for determining whether a transportation activity conforms to a SIP. *See* 42 U.S.C. § 7506(c). The conformity provision prohibits federal agencies from approving or supporting any activity which does not conform to a SIP.[15] Under the

---

14. Prior to the 1990 amendments, the CAA's transportation conformity requirements were "largely ... ignored by the agencies required to apply [them]." 136 CONG. REC. S16972 (daily ed. Oct. 27, 1990) (statement of Senator Baucus); *see also id.* (explaining that "no transportation plan has ever been disapproved under [section 176(c) ], even in cities where mobile source emission growth is a major factor in preventing attainment of the NAAQS"); *Environmental Defense Fund v. EPA*, 167 F.3d 641, 643 (D.C.Cir.1999). The initial compliance deadline in the 1970 Act (1975) and the extended deadlines set forth in the 1977 Amendments (1982 and 1987) passed unmet. *See* S. REP. NO. 228, at 10–11 (1989).

15. Section 176(c) of the CAA states in part:
    (c) Activities not conforming to approved or promulgated plans

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of Title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means-

new criteria, conformity means that the activity will not cause new violations, increase the frequency or severity of violations, or delay attainment of various standards, requirements, and milestones. *See* 42 U.S.C. § 7506(c)(1)(B). Second, the 1990 amendments integrate the attainment and maintenance of air quality standards with the specific transportation planning process prescribed by the Urban Mass Transportation Act and the Federal–Aid Highway Act, 23 U.S.C. §§ 101–106. *See supra* text at note 3; *see also Environmental Defense Fund*, 167 F.3d at 644. As the Clean Air Act Conference Report put it, "[t]he purpose of the new 'conformity' requirement is to ensure that the transportation systems choices made by the community and incorporated into the regional transportation plan required by [federal transportation statutes] are consistent with achieving the allowable emission targets for each pollutant assigned to mobile sources in the SIP." 136 CONG. REC. at 36,106 col. 2. Thus, the "heart of the 1990 conformity requirements consists of restrictions on approval and funding of transportation plans, programs, and projects." *Environmental Defense Fund*, 167 F.3d at 644.

In addition to specifying general conformity criteria and imposing restrictions on regional transportation planning, the 1990 amendments also authorized EPA to promulgate criteria and procedures for determining conformity, provided that "in no case shall [conformity] determinations for transportation plans and programs be less

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not-

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

(2) Any transportation plan or program developed pursuant to Title 23 or the Urban Mass Transportation Act shall implement the transportation provisions of any applicable implementation plan approved under this chapter applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter. In particular—

(A) no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under Title 23 or the Urban Mass Transportation Act, or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);

(B) no metropolitan planning organization or other recipient of funds under Title 23 or the Urban Mass Transportation Act shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan. . . .

CAA § 176(c)(1) and (2), 42 U.S.C. § 7506(c)(1) and (2).

frequent than every three years." *Id.* § 7506(c)(4)(B)(ii). EPA first issued criteria and procedures for making conformity determinations in 1993. *See* 58 Fed.Reg. 62,188 (1993). It then amended those procedures in a series of rulemakings. *See* 60 Fed.Reg. 40,098 (1995); 60 Fed.Reg. 57,-179 (1995). In this case, the parties present differing interpretations of CAA § 176(c), 42 U.S.C. § 7506(c) [16] and the most recent promulgated regulations. *See* 62 Fed.Reg. 43,780 (1997) (codified at 40 C.F.R. §§ 93.100–93.128).

## 2. *Discussion*

The crux of the plaintiffs' complaint for both Counts I and II is that the 2025 RTP and 2001–03 TIP do not conform with the MVEB provided for in the RFP SIP, thus violating 42 U.S.C. § 7506(c). Specifically, the plaintiffs note that the RFP SIP (proposed in 1996 and approved in 1999) sought to limit motor vehicle NOx emissions to 214.77 tpd by the year 1999. The plaintiffs allege that ARC's emissions analysis for the years 2000 to 2004 in the 2025 RTP and 2001–03 TIP indicate that NOx emissions would exceed 214.77 tpd. Accordingly, the plaintiffs argue that the 2025 RTP and 2001–03 TIP were adopted and approved by the defendants "despite the fact that ARC's emissions analysis showed motor vehicle emissions exceeded the MVEB in the applicable implementation plan by 50 tpd and would not reach the levels required by the SIP until years after all the highway projects in the 2001–03 TIP are approved, funded and completed." Thus, it is the plaintiffs' position that the approval of the 2025 RTP and 2001–03 TIP explicitly violated the statutory mandate of section 7506 by not immediately conforming to the RFP SIP and in delaying the timely attainment of the 214.77 tpd

level until the year 2005. The defendants respond to the plaintiffs' allegations by raising several arguments. The defendants essentially argue that the plaintiffs have an oversimplified interpretation of section 7506 by ignoring the applicable regulations for conformity decisions, ignoring the "basic structure" of the CAA, and by demanding an overly strict interpretation of conformity that is unpractical.

In this case, the court is being called upon to interpret complicated statutory and regulatory text for which both groups of parties offer varying interpretations. To address the myriad of arguments raised by the parties, the court presents two questions which the court perceives are central to Counts I and II: *(1) Is the year 2005 the appropriate first year to perform an emission analysis to show conformity with an MVEB?; and (2) Does the failure to meet the 1999 attainment deadline prohibit the approval of an RTP and TIP which do not immediately conform to the applicable MVEB at the date of adoption?* The court, although reserving its final ruling until a full disposition on the merits, finds that the plaintiffs have failed to establish at this time that there is a "substantial" likelihood that they will prevail on either of these questions, and thus on their claims under Counts I and II.

### a. *Question One*

■ For question one, both sides agree that the RFP SIP, with its budget of 214.77 tpd of NOx, is the applicable MVEB to demonstrate conformity in this case. However, the parties disagree as to when a proper emissions analysis must be performed to demonstrate conformity under section 7506(c) and the accompanying reg-

---

**16.** The court will hereinafter refer to section 176 as codified in the United States Code as

42 U.S.C. § 7506.

ulations. The plaintiffs maintain that conformity with the MVEB through projected emissions analysis must be demonstrated at the date of adoption of a proposed RTP and TIP. The defendants assert that conformity with the applicable MVEB must only be shown for the first emissions analysis year which may be five years from the year of the conformity determination and for certain future years thereafter.

The defendants first contend that the current regulations promulgated under 40 C.F.R. Part 93 "reduce the generalized mandate of section 7506 to specific criteria and procedures that can actually be used for planning and decision-making purposes." The defendants maintain that 40 C.F.R. §§ 93.106(a) and 93.118(b) in particular govern the selection of regional emissions analysis years and the applicable MVEB to the analysis year. The defendants state the conformity determination report submitted to USDOT on April 4,

2000 was written to demonstrate conformity of the 2025 RTP and 2001–03 TIP with the proposed October 1999 SIP in accordance with 40 C.F.R. §§ 93.106(a) and 93.118(b). However, when the Eleventh Circuit stayed the October 1999 SIP on July 18, 2000, the October 1999 SIP could no longer serve as the "applicable implementation plan" for conformity purposes. Thus, the defendants state that the remaining applicable implementation plan was the RFP SIP which was proposed in 1996 and approved in 1999.

Because the RFP SIP did not establish an MVEB for any year within the forecast period of the 2025 RTP, the defendants state that they were only required under 40 C.F.R. § 93.118(b) [17] to model emissions for the last year of the 2025 RTP forecast period (2025) and for intervening years no more than ten years apart (2015, 2025). Furthermore, under 40 C.F.R. § 93.106(a), [18] ARC used the year 2005 to ensure that the first analysis year was no

**17.** Section 93.118 of the Conformity Rule states in part:

> (a) The transportation plan, TIP, and project not from a conforming transportation plan and TIP must be consistent with the motor vehicle emissions budget(s) in the applicable implementation plan (or implementation plan submission). This criterion applies as described in § 93.109(c) through (g). This criterion is satisfied if it is demonstrated that emissions of the pollutants or pollutant precursors described in paragraph (c) of this section are less than or equal to the motor vehicle emissions budget(s) established in the applicable implementation plan or implementation plan submission.
>
> (b) *Consistency with the motor vehicle emissions budget(s) must be demonstrated for each year for which the applicable (and/or submitted) implementation plan specifically establishes motor vehicle emissions budget(s), for the last year of the transportation plan's forecast period, and for any intermediate years as necessary so that the years for which consistency is demonstrated are no more than ten years apart,* as follows:
>
> > (1) Until a maintenance plan is submitted:

> > (i) Emissions in each year (such as milestone years and the attainment year) for which the control strategy implementation plan revision establishes motor vehicle emissions budget(s) must be less than or equal to that year's motor vehicle emissions budget(s); and
> >
> > (ii) *Emissions in years for which no motor vehicle emissions budget(s) are specifically established must be less than or equal to the motor vehicle emissions budget(s) established for the most recent prior year. For example, emissions in years after the attainment year for which the implementation plan does not establish a budget must be less than or equal to the motor vehicle emissions budget(s) for the attainment year.*
>
> 40 C.F.R. § 93.118(a) and (b) (emphasis added).

**18.** Section 93.106(a) states in part:

> (a) Transportation plans adopted after January 1, 1997 in serious, severe, or extreme ozone nonattainment areas and in serious CO nonattainment areas. If the metropolitan planning area contains an urbanized area population greater than 200,000, the transportation plan must specifically de-

more than ten years from the base year used to validate the transportation model. The defendants state that 2005 was selected because the validation year for the transportation model was 1995. In support of their limited interpretation that emissions analysis must only be performed in specific years, the defendants rely on the 1993 version of the regulations which contains language limiting emissions analysis for certain future years.[19] Finally, the defendants contest the practicality of plaintiffs' interpretation of section 7506(c) as requiring a proposed RTP or TIP "to conform at the time of adoption and approval." The defendants assert that emissions analysis from a proposed RTP or TIP must be conducted years ahead because a proposed RTP or TIP could not

"have any impact on motor vehicle emissions until the projects are actually adopted, and then designed, and then constructed, and then opened for service." Therefore, "[a]nalysis of regional emissions in the very early years of such a plan would serve no purpose."

In reply, the plaintiffs contend that the regulations require emissions analysis to show conformity for "all future years," thereby making 2005 an inappropriate year to perform the first emissions analysis to demonstrate conformity. The plaintiffs attempt to refute the 1993 regulatory language quoted by the defendants, *see supra* note 19, by quoting passages from the 1997 revisions of the conformity rule regulations. The 1997 language states that "SIP budgets continue to apply for

scribe the transportation system envisioned for certain future years which shall be called horizon years.

(1) The agency or organization developing the transportation plan may choose any years to be horizon years, subject to the following restrictions:

(i) Horizon years may be no more than 10 years apart;

(ii) The first horizon year may be no more than 10 years from the base year used to validate the transportation demand planning model;

(iii) If the attainment year is in the time span of the transportation plan, the attainment year must be a horizon year; and

(iv) The last horizon year must be the last year of the transportation plan's forecast period.

(2) For these horizon years:

(i) The transportation plan shall quantify and document the demographic and employment factors influencing expected transportation demand, including land use forecasts, in accordance with implementation plan provisions and the consultation requirements specified by § 93.105;

(ii) The highway and transit system shall be described in terms of the regionally significant additions or modifications to the existing transportation network

which the transportation plan envisions to be operational in the horizon years. Additions and modifications to the highway network shall be sufficiently identified to indicate intersections with existing regionally significant facilities, and to determine their effect on route options between transportation analysis zones....

40 C.F.R. § 93.106(a).

**19.** The 1993 final rule states in part the following:

Today's final rule requires transportation plans and TIPs to demonstrate consistency with the SIP's motor vehicle emissions budget by performing a regional emissions analysis. This emissions analysis must include emissions from the nonattainment or maintenance area's entire existing transportation network (as described in the rule), in addition to all proposed regionally significant Federal and non-federal highway and transit projects. *The regional emissions analysis must estimate total projected emissions for certain future years (including the attainment year),* and may include the effects of any emission control programs which are already adopted by the enforcing jurisdiction (such as vehicle inspection and maintenance programs and reformulated gasoline and diesel fuel).

Final Rule, 58 Fed.Reg. 62195 (Nov. 24, 1993) (emphasis added).

conformity purposes for *all future years* until superseded by other SIP revisions." 62 Fed.Reg. 43,787 (Nov. 24, 1997) (emphasis added). Therefore, the plaintiffs contend that the current 1997 regulations disposed of the 1993 requirements of performing emissions analysis in certain future years. The plaintiffs also note that section 93.118(b)(1)(ii) requires that "[e]missions in years for which no [MVEB] are specifically established must be less than or equal to the [MVEB] established for the most recent prior year." *See supra* note 17. Because 1999 was the last year when an MVEB was established, the plaintiffs contend that proposed RTPs and TIPs must show conformity for *all* years after 1999, or at least until a new SIP is implemented.

The plaintiffs also contest the defendants' reliance on "horizon years" as the exclusive years for required emissions analysis. *See supra* note 18 (quoting 40 C.F.R. § 93.106). The plaintiffs contend that nowhere in section 93.118 does the term "horizon years" appear and the use of the term in section 93.106 "says nothing about the years for which emissions analyses may or must be performed." Moreover, the plaintiffs point to section 93.118(d)(2), which contains language that states that emissions analysis may be performed "for any years in the timeframe of the transportation plan." Therefore, the plaintiffs argue that the regulations clearly permit emissions analysis to be performed in years other than those proposed by the defendants.

Finally, the plaintiffs note that conformity of a proposed RTP and TIP at the date of adoption is not impossible or impractical. The plaintiffs point to transportation demand measures such as those implemented during the Olympic Games, which could immediately reduce emissions levels to the attainment goal of 214.77 tpd level of NOx. The plaintiffs contend that the failure of the defendants to include such measures in the 2025 RTP and 2001–03 TIP for the purposes of immediately reducing NOx levels to the attainment level of 214.77 tpd, violated section 7506(c).

During the hearing held before the court, the defendants responded to these arguments. First, the defendants attacked the plaintiffs' argument that the 1997 rule revisions eliminated the requirement that emissions analysis only be performed in future years. The defendants state that the full text of the plaintiffs' quoted text, taken in context, clearly indicates that the 1997 revision also kept the 1993 conformity rule concerning emissions analysis.[20] Thus, the current version of the rule adopts the 1993 version's acceptance of performing emissions analysis only in certain years. Second, the defendants quote a passage from a description of the "proposed" 1997 revision of the 1993 conformity rule regulations to support their argument that 2005 is the appropriate year for the first emissions analysis. The passage provides that "the first analysis year shall be no more than five years beyond the year in which the conformity determination is being made." [21] Proposed

---

**20.** The defendants point to the sentence directly preceding the plaintiffs' quotation: *"This final rule retains the November 1993 conformity rule's requirements.* Conformity must continue to be demonstrated over a 20–year timeframe, and SIP budgets continue to apply for conformity purposes for all future years until superseded by other SIP revisions." 62 Fed.Reg. 43,787 (emphasis added).

**21.** The passage is highlighted in the text:

> *G. Budget Test*
> This proposal would combine existing §§ 51.428–51.432 (§§ 93.118–93.120) into one streamlined section that describes the budget test for the transportation plan, TIP, and project not from a conforming plan and TIP. As described in section III. of this preamble, the implementation of the budget

Rule, 61 Fed.Reg. 36130 (July 9, 1996). Thus, the defendants contend that the regulations only require an emissions analysis to be performed five years after the date the conformity determination is to be made.

After considering the arguments of opposing counsel and examining the regulations, the court preliminarily finds that the defendants have presented more persuasive arguments for their interpretation of the statute and regulations. First, the defendants have successfully rebutted the plaintiffs' contention that the 1997 regulations dispensed with performing emissions analyses for "certain years" and now requires conformity for "all future years." *See supra* note 20. Second, the defendants have located language in the discussion surrounding the 1997 proposed rules which indicates that "the first analysis year shall be no more than five years beyond the year in which the conformity determination is being made." *See supra* note 21. Third, regulatory language quoted by the plaintiffs such as section 93.118(d)(2) indicates that performing emissions analysis in years other than the "mandatory" years noted by the defendants appears to be permissive and not compulsory. Fourth, although the plaintiffs have emphasized section 93.118(b)(1)(ii) as requiring conformity with an MVEB from a past attainment for all future years of an RTP or TIP, *see supra* note 17, the section does not specify if the "emissions in years after the attainment year" applies to *all* subsequent years or only to all *emissions analysis* years which the defendants note are only to be performed in certain years. Fifth, the court is persuaded that performing an emissions analysis for the year of adoption would not serve the purpose of demonstrating conformity because the plans could not have an effect on air quality at the time of adoption.

Finally, the court is directed to another provision in the regulations which supports the defendants' position. Section 93.119 of the regulations, a provision which only applies if a nonattainment area has never had "previous[ly] approved [SIPs] or [SIP] submissions with [MVEBs]," 40 C.F.R. § 93.118(e)(2), provides its own emissions reduction tests. Subsection (e) concerns the first proper analysis years for projecting regional emissions. The subsection states: "The regional emissions analysis must be performed for analysis years that are no more than ten years apart. The first analysis year must be no more than five years beyond the year in which the conformity determination is being made. The last year of the [RTP's] forecast period must also be an analysis year." 40 C.F.R. § 93.119(e). Although this provision is not the applicable regulation in this case, the express language describing the analysis years supports the defendants' interpretation of the correct analysis years noted in sections 93.118 and 93.106, includ-

test and the years for which budgets apply would be clarified.

*H. Emission Reduction Tests*

This proposal would combine existing §§ 51.436–51.446 (§§ 93.122–93.127), which describe the tests for emission reductions in the interim period for ozone, CO, PM sub10, and NO sub2 areas, into one streamlined section that addresses all pollutants and the transportation plan, TIP, and project not from a conforming plan and TIP. This would avoid the repetition of the definitions of the "Baseline" and "Action" scenarios and improve the readability of the transportation conformity rule. *This proposal would provide that the first analysis year shall be no more than five years beyond the year in which the conformity determination is being made. The existing conformity rule requires the first analysis year to be 1995 in CO nonattainment areas and 1996 in ozone nonattainment areas. This requirement is obviously no longer appropriate, because conformity is not intended to be assessed retrospectively.*

61 Fed.Reg. 36130 (emphasis added).

ing emissions analysis during "horizon years." Therefore, at this stage of the case, the plaintiffs have failed to convince the court of their interpretation of the statute and regulations for the first question.

### 2. *Question Two*

■ Turning to question two, both sides agree that Atlanta has not met the 214.77 tpd NOx level for the 1999 attainment deadline. However, the parties dispute what the consequences of the failure to meet the attainment deadline has on the adoption and approval of new transportation projects. The plaintiffs argue that the failure to meet the 1999 attainment deadline precludes the defendants from adopting an RTP and TIP which do not conform at the date of adoption because it violates the express provisions of section 7506(c) by "delay[ing] timely attainment." The defendants contend that the failure to meet the attainment deadline does not impose the sanction of construction bans or funding limitations on future RTPs and TIPs and does not require an MPO or other agency to find conformity of a proposed RTP and TIP at the date of adoption.

First, the plaintiffs argue that section 7506(c)(1)(B)(iii), which prohibits agencies from "delay[ing] timely attainment," clearly mandates attainment deadlines must be met as a condition for demonstrating the conformity of any federally approved or funded activity. The plaintiffs contend

that the defendants have presented no statutory authority which permits transportation agencies to adopt and approve an RTP and TIP that "ignore the statutory deadline for achieving emissions reductions mandated by milestones expressed as MVEBs in the SIP." The plaintiffs also argue that the 1990 Amendments added an "affirmative duty" for MPOs to adopt RTPs and TIPs which will achieve "expeditious attainment of such standards." 42 U.S.C. § 7506(c)(1)(A). Thus, even if the defendants fully complied with the conformity determination regulations, the expiration of the attainment deadline in 1999 imposes a duty (through section 7506(c)(1) and (2)) on the defendants to attain the 214.77 tpd level as quickly as possible.

The defendants respond that the plaintiffs ignore the "basic structure" of the CAA by noting that the legislative history of the Act indicates the CAA would not "impose construction bans or highway funding limitations," *see* S. REP. No. 101–228 at 47, *reprinted in* 1990 U.S.C.C.A.N. 3385, 3433, when a nonattainment area fails to meet the attainment deadline.[22] The defendants note that highway construction bans are imposed under the CAA only in very limited circumstances under 42 U.S.C. § 7509(a) and will not be imposed against nonattainment areas less than "severe" under 42 U.S.C. § 7511(b)(4). The defendants also point to case law where courts interpreting section 7506(c) found similar provisions of the sec-

---

**22.** A more complete text of the Senate Report states in part:

> The bill does not impose construction bans or highway funding limitations for areas that fail to attain the standard. The bill is designed to induce areas to implement all available measures during the period prior to the attainment deadline. If an area does not attain the air quality standard by the deadline, it is required to adopt controls and measures applicable to the next higher ozone classification, and in serious, severe

and extreme areas, major stationary sources of VOCs are required to pay a fee of $5,000 per ton emitted in excess of 50 percent of the amount actually emitted in the year the standard was to have been attained. This is an incentive for these sources to reduce the VOCs further; if a source cuts emissions in half, it will no longer be required to pay the $5,000 per ton fee.

S. REP. No. 101–228 at 47, *reprinted in* 1990 U.S.C.C.A.N. 3385, 3433.

tion to not require exact correspondence between the SIP schedule and the TIP's implementation schedule. *See Environmental Defense Fund v. EPA,* 82 F.3d 451, 457 (D.C.Cir.1996).

Finally, during oral argument the defendants contested the plaintiffs' broad statutory interpretation of section 7506(c). The defendants noted that they were only required to comply with the conformity rule promulgated pursuant to the statute and did not have an "affirmative duty" to comply with the mandate of section 7506(c), especially the subsection requiring an agency performing a conformity determination to not "delay timely attainment." The defendants argue that the effect of the failure to achieve attainment of 214.77 tpd level by 1999 results in the imposition of certain sanctions, but does not require a proposed RTP and TIP to conform at adoption. The defendants state that the failure to meet the 1999 attainment deadline only forces a state to revise its SIP or reclassify the offending nonattainment area to a higher attainment status such as severe. *See* 42 U.S.C. § 7509(a), (d). The defendants concede that withholding of highway funding is an available sanction under the CAA, however, the sanction is only used in the limited circumstances when states fail to submit a SIP, the EPA disapproves a submitted SIP, the EPA finds that an approved SIP is not being implemented, and a severe nonattainment area fails to meet an attainment date. *See* 42 U.S.C. §§ 7509(a), (b); 7511(b)(4). The defendants contend that none of these violations is at issue in this case.

The court is persuaded at this juncture that the failure of Atlanta to meet the 1999 attainment deadline would not require the immediate conformity of proposed RTPs and TIPs to meet the 214.77 tpd level. First, as the defendants have shown, the applicable sanction for not meeting an attainment deadline is upgrading the offend-

ing area to the next level of nonattainment classification and/or compelling the state to revise its SIP. Second, the Congressional Record indicates that the 1990 amendments to the CAA were not intended to impose unilateral construction bans. Third, the plaintiffs' construction of section 7506(c) is at odds with the promulgated conformity regulations which the court has already found require a showing of conformity to the applicable MVEB in certain future years. Fourth, the plaintiffs have offered no authority besides the bare language of section 7506(c)(1)(B)(iii) which would compel the defendants to find conformity of a proposed RTP and TIP at the time of adoption because the area had not met its attainment deadline.

In conclusion, upon considering the arguments of counsel and examining the pertinent statutory and regulatory framework, the court finds that the plaintiffs have failed to show that there is a "substantial" likelihood of success on the merits on Counts I and II of the complaint. However, the court recognizes that the plaintiffs have raised several plausible interpretations of the statute and regulations and that many of the issues before the court are of first impression. Therefore, the court cannot conclude at this stage that the plaintiffs' claims fail as a matter law. Accordingly, although the court has not ruled that the plaintiffs' claims arising under section 7506(c) fail as a matter of law, the court, for the purposes of ruling on the motion for preliminary injunction, finds that the plaintiffs have failed to meet their burden of demonstrating that there is a "substantial" likelihood of success on the merits of Counts I and II of the complaint.

B. *Failure to Adhere to Public Involvement and Rulemaking Procedures*

■ The plaintiffs also contend that they will prevail on the merits of their

public involvement and procedure claims. First, the plaintiffs argue that the defendants violated 5 U.S.C. § 553 when they did not provide adequate information or allow public comment on the use of the 2005 analysis year to show conformity. Second, the plaintiffs state that the US-DOT violated 40 C.F.R. § 93.105(e),[23] and 23 C.F.R. § 450.316(b)(1) by approving the conformity determination made by ARC using the 2005 emissions analysis year with no public comment.

The defendants respond that all the agencies were not required to conduct public comment hearings before approval of the conformity determination because the Interagency Transportation Conformity Memorandum of Agreement ("MOA") signed by ARC, Georgia Department of Transportation and the Federal Highway Administration designate ARC as the "public consultation mechanism both for transportation planning and for conformity determinations." MOA § 106(k). The memorandum further states that ARC "[p]rovides opportunity for public review and comment and responds in writing to all public comments." *Id.* § 106(f)(5). The defendants contend that the administrative record "is replete with the complete public involvement process conducted by ARC under the requirement of section 106(k) and the applicable federal regulations." Specifically, ARC notes that in at least one formal public hearing and in numerous official public meetings, the public was provided information regarding the use of the RFP SIP and the 214.77 tpd budget. ARC states that the presenta-

tions pointed out that the possibility existed that the 224 tpd budget from the October 1999 SIP would not be approved by the EPA and, if it was not approved, then the 214.77 tpd budget from the RFP SIP, with an analysis year of 2005, would be relied upon. In support of this argument, the defendants have submitted affidavits of ARC officers Joel Stone, Harry West and John Orr, who were present at the public meetings and state that they discussed the possible use of the 2005 analysis year. *See* Affs. of Stone, West and Orr, ARC Exhibits 3–5. Thus, the defendants state that they fully complied with the public comment requirements.

The plaintiffs reply that the alleged "notice" of using the RFP SIP budget and the 2005 emissions analysis year was wholly inadequate. The plaintiffs state that the only notice of the possible use of the 2005 analysis year were two slides that the defendants quickly flashed on the screen and which contained fine print that was impossible to read. Moreover, the plaintiffs argue that the slides provided no notice or an opportunity to comment on the agencies' "construction of the applicable statutory and regulatory provisions governing demonstrations of conformity with MVEBs for prior years, and certainly provided no suggestion that the agencies would construe these provisions not to require that emissions meet the MVEB prior to 2205."

As set forth above, this court will reserve its ruling on the merits of this case until such time as the case has been submitted on the merits, which will give the

---

**23.** Section 93.105(e) states the following in part:

(e) Public consultation procedures. Affected agencies making conformity determinations on transportation plans, programs, and projects shall establish a proactive public involvement process which provides opportunity for public review and comment by, at a minimum, providing reasonable

public access to technical and policy information considered by the agency at the beginning of the public comment period and prior to taking formal action on a conformity determination for all transportation plans and TIPs, consistent with these requirements and those of 23 C.F.R. 450.316(b). . . .

court an opportunity to conduct a more thorough examination of the administrative record. However, at least preliminarily, this court does not find that the plaintiffs have demonstrated a substantial likelihood of success on the merits with regard to their assertions that defendants violated their statutory obligation for public involvement and the associated procedures.

### III. *Balancing of Harms and the Public Interest*

██ In addition to presenting arguments on irreparable harm, the parties also made extensive references to the balancing of harms and the public interest prerequisites, which the court will consider together. In support of showing harm to the defendants and the public interest, the defendants offered the testimony of Georgia Governor Roy Barnes. Governor Barnes, whose often impassioned statements indicated that an injunction "would be disastrous transportation-wise and disastrous politically," made several points. The Governor noted that he and the Georgia legislature had attempted over the course of three years to fundamentally change the approval process of transportation plans in the Atlanta area by creating a state agency known as the Georgia Regional Transportation Authority ("GRTA"). GRTA operates by coordinating several counties to adopt a comprehensive plan including extensive transit measures. The Governor stated that the current 2001–03 TIP is unprecedented because for the first time the Atlanta area has shifted in favor of transit measures and away from automobile capacity increasing projects. The Governor also noted that throughout the planning process he and the various state agencies allowed substantial input from the plaintiffs concerning the 2025 RTP and 2001–03 TIP and even permitted a three

month extension for negotiations with the plaintiffs before plan approval.

The Governor agreed that some capacity increasing highway projects were included within the 2001–03 TIP, but stated that these projects were essential to the comprehensive network foreseen by the plan. The Governor stated that some roads must be expanded and modified to create an integrated network with train and bus depots or few people would make the choice to take public transit. For example, the Governor noted that new HOV lanes are needed so buses could travel quickly enough for people to opt for taking a bus to work or for riding a bus to a train station.

The Governor testified that enjoining the plans would be harmful to the defendants and to the public by halting these connecting projects to transit routes for trains and buses and that the injunction would destroy the confidence of the legislature and the public in the planning process.[24] The Governor stated that even if the court enjoined only the capacity increasing highway projects, the transit projects would be essentially useless without the integrated network of roads. More importantly, the Governor stated that businesses and the public would be unwilling to buy bonds to support new transit projects if the process was stopped by the plaintiffs. The Governor also testified that state money raised for these projects would instead be sent to rural districts in the state on pressure from members of the Georgia legislature. Finally, the Governor noted that many of the measures proposed by the plaintiffs, including broad transportation demand measures which attempt to compel commuters to drive less, would be unpractical and politically unfeasible.

---

**24.** The Governor emphatically remarked that enjoining the 2001–03 TIP and 2025 RTP would "throw a hand grenade in the middle of it . . . and frag everybody."

To demonstrate the balance of harm in their favor, the plaintiffs again emphasized the public health concerns and downplayed the harms of loss of confidence in public officials and the process of resubmitting a new 2025 RTP and 2001–03 TIP for approval. The plaintiffs noted that the defendants could easily prepare an interim TIP which could include better transportation measures, such as demand management strategies, that could be implemented immediately. In support of this argument, the plaintiffs pointed to the affidavits of Graham, Johnston and Replogle which set forth the effectiveness of such demand management measures. The plaintiffs also disputed the Governor's assertion that federal funding would be spent in other districts if the current plans were enjoined.

Upon consideration of the balance of harms between the parties, the court finds that the balance of harms weighs in favor of the defendants. The court has already found that the plaintiffs have failed to establish irreparable harm and the defendants have presented ample, persuasive testimony that the defendants would be harmed by the imposition of an injunction at this time.

Also with regard to the consideration of the public interest, it appears to be virtually undisputed that none of the projects contained in the 2001–03 TIP could go forward under the system of highway construction unless they are a part of an approved TIP. If this court were to enjoin the implementation of the TIP, none of the projects—even those favored by the plaintiffs, could go forward until an interim TIP was approved. While there are varying accounts about how long it would take to get approval of an interim TIP, Mr. Weyandt's testimony indicated that it would take at least twenty-two weeks. That being the case, this court is left with the conclusion that the public interest would be harmed if this court enjoined implementation of the current TIP.

*Summary*

In conclusion, the court finds that the plaintiffs have failed to establish the prerequisites of irreparable harm, balance of harms in their favor and the public interest. The court also finds that the plaintiffs have failed to show that they are substantially likely to prevail on the merits. Accordingly, the plaintiffs' motion for preliminary injunction [Doc. No. 15–1] is DENIED. The defendants' oral motion to strike the affidavits of Robert Johnston and Micheal Replogle is DENIED. The plaintiffs' oral motion to strike the affidavits of Joel Stone, Harry West and John Orr is DENIED. The court DIRECTS the parties to file a preliminary planning report and scheduling order pursuant to Local Rule 16.2 within twenty (20) days of the docketing of this order.